Would you state your name for the record and the side that you're representing. Megan Crane representing appellant Jose Velasco. And I'm Assistant State's Attorney Iris Ferrosi for the people. Good morning. May it please the court. Megan Crane on behalf of appellant Jose Velasco. Beginning with Mr. Velasco's actual innocence claim. My client was convicted of murder at 16 years old without any physical evidence tying him to the crime, without any statements, and without even an explanation for why he might kill his close childhood friend and then run into rival gang territory. At trial, the state's case rested entirely upon two eyewitnesses. Precisely the kind of evidence that our Supreme Court and People v. Lerma has now instructed warrants scrutiny. From day one, Mr. Velasco has maintained his innocence. Even the victim's family has always believed he's innocent. Before trial, they told police, they told the state's attorney, you've got the wrong guy. This case has never made sense. But now it does. Because now we have a mountain of newly discovered evidence proving that Mr. Velasco is actually innocent. We have new eyewitnesses who, unlike the state's witnesses, were not strangers. These were people from the neighborhood who knew Mr. Velasco well and knew the real perpetrator Miguel Perez well. And they were 100% certain that Jose Velasco was not the shooter. We have Max Hernandez, who was standing next to the victim when he was shot. We have Erica Vargas, who was watching from a third-story apartment window. We have Claudia Cruz, the cousin of the real perpetrator, who saw him from down the street and called his name. He turned his head and nodded at her in recognition before running across Blue Island. Before we get into this mountain of new evidence, and certainly you've presented a lot of exhibits, and let's start with Claudia Cruz. Can we consider the unnotarized statement of Claudia Cruz? Your Honor, you can consider it. This statement was sworn under the penalty of perjury. It was taken by an officer of the court. And the only reason it doesn't have a notary stamp is because she was incarcerated at the time and a notary was not present. Pursuant to the act, you can consider this statement as other evidence. In all the cases, the state cites to the contrary, and filed petitions that were supported only by a single unnotarized affidavit. And those petitions were rejected on that basis. So People v. Allen does not decide this issue? It does not decide this issue. It is within your discretion, and here where it is sworn under the penalty of perjury, where she thought she was speaking under the penalty of perjury, which is the important thing, and where her statement is corroborated by the other witnesses, and the details are also corroborated by the state. The state's witnesses at trial, there we have proof that this is a reliable statement. But to the extent that there are questions of reliability because of the lack of notarization. I'm not concerned about that reliability at this point, but what People v. Allen holds. Well, I believe under the case law, it does not prohibit you from considering this affidavit, this statement. It is within your discretion how you want to handle this affidavit. And unlike the majority of the cases cited by the state where there is only one unnotarized statement, here where there are many other affidavits and statements that corroborate this unnotarized statement, it is our position that within your discretion you should consider this affidavit. You should consider this equally to the notarized affidavit. But aren't there other unnotarized statements as well? There is one other unnotarized affidavit, and that is the recantation of the state eyewitness, Andrea Thomas. That one was also sworn under the penalty of perjury, taken by an officer of the court, and similarly, it only didn't have the notary stamp because she was incarcerated and the notary was not present. And her statement is corroborated by a second state witness, Javon Allens, who confirms what she says, that both she and the other state eyewitness were high and drunk at the time of the shooting, and that both admitted to him that they did not see the shooter's face when he drove home with them after the shooting. How is Mr. Allens newly discovered? Mr. Allens is newly discovered for the same reasons that the lower court held Andrea Thomas is newly discovered. The case law from the Illinois Supreme Court and from this court made clear that where a state witness, where the petitioner, the defendant at the time, had no evidence available to prove that a state witness may have been lying to the police, to the state's attorney, to the jury, then he did not have the burden of flipping them at that time. And that's people v. Weidman and people v. Montanez. In addition to our new eyewitnesses, we also now have a new ear witness, Jonathan Miscauscus, who is a fellow gang member to the real perpetrator, Miguel Perez, and he heard him confess to the crime within days of the shooting and bragged that someone else had been arrested for his crime. But that's not all. We mentioned Andrea Thomas already. This is one of the state's two eyewitnesses, and she has now recanted her identification. In a seven-page detailed statement, she admits she never saw the shooter's face. She admits that they were both drunk and high at the time of the shooting. And as we discussed, Javon Allens corroborates that they were drunk and high and that they didn't see the shooter's face. The lower court erred when it rejected this powerful case of actual innocence. While required to assume the truth of petitioner's witnesses and petitioner's allegations, it rejected each and every one on credibility determinations that the case law is crystal clear or prohibited at this second stage proceeding. And I'll give you a couple of examples. With regard to Andrea Thomas' recantation, the lower court rejected her recantation because it concluded it was contradicted by her trial testimony. But of course, that is the definition of a recantation. It is also a factual decision to credit her prior testimony over her new statement. And that is exactly the type of credibility determination you can't make at a second stage proceeding. And people of these standards, they say that applies to testimony within the same proceedings, within earlier proceedings. And that is particularly true where the post-conviction judge was not the judge that presided over trial. So this judge never saw Andrea Thomas testify, never judged her credibility for himself. He attempts to justify himself, the lower court attempts to justify his decision on case law that says recantations can be summarily dismissed as inherently unreliable. But the Illinois Supreme Court has squarely rejected this old case law, in people v. Coleman, in people v. Sanders, saying that recantations must go to the third stage. Because a rejection of them requires precisely the type of credibility determination not allowed at the second stage. And a second example, let's take the other statewide witness, Michelle Scott. The lower court rejected each and every one of Mr. Velasco's new witnesses to his innocence on the basis that they were purportedly rebutted by Michelle Scott. To do this, it required him to find Michelle Scott credible. And if there's any question that that's what the lower court was doing, we can go to the words of his order. On page 10, the lower court finds Michelle Scott credible and uses that as a basis to reject Andrea Thomas' statement. On page 12, the lower court finds her credible and uses that as a basis to reject Yvonne Ollins. On page 16, the lower court finds Michelle Scott credible and uses that as a basis to reject Erica Vargas. Now, I expect the state will tell you that the lower court was entitled to determine if the new evidence was positively rebutted by the trial record. But this is not what positive rebuttal means. The classic example of positive rebuttal, as in people v. Sanders, was where the physical evidence at trial rebutts new witnesses, new evidence. That's not the case here because there was no physical evidence. Where it is essentially a contest of credibility of witnesses, then that evaluation can only happen at the third stage. And a third example. The lower court rejected every witness that supported Mr. Velasco's trial theory that an Ambrose gang member actually killed Juan Luna. Because the court concluded the jury did not find this theory credible. Again, that is a credibility determination based on prior proceedings that cannot be relied upon at the second stage. Doesn't it fall from the jury verdict? Well, it actually begs the question here. Because the standard for the actual innocence claim before you is a forward-looking standard. And it asks not what did the jury think earlier. It asks what would future jurors do with this new evidence. The former jurors were presented with a trial theory that was completely unsupported by any evidence. The opposite is true here. Where the theory at trial, the truth, is now supported by multiple statements from new eyewitnesses, new earwitnesses, and recantations from state witnesses. And the case law in Coleman, in Ortiz, makes clear that when new witnesses directly contradict state witnesses, then a hearing, not dismissal, is required. And that is precisely the case here. The lower court also erred when it rejected Mr. Velasco's witnesses on procedural technicalities. He rejected Jonathan Moskosko's affidavit on the basis that it contained hearsay evidence. But new rule of evidence, 1101B3, makes clear that the rules of evidence, including hearsay, do not apply at post-conviction proceedings. And even if they did, this court in People v. Warren held them in a high-stakes case like this, where a juvenile was put away for almost his entire life, that fairness and accuracy require consideration of that hearsay evidence. Moreover, exceptions to the hearsay rule apply here. But in order to determine if they apply, the Chamber's analysis requires you to evaluate the reliability of the evidence. And as the court found in Warren, that analysis can only be done at the third stage. The lower court also rejected Erica Vargas' statement on the basis that it lacked foundation, because she didn't say the date or the time or name the victim of the shooting that she observed. But she did say in her affidavit that the next day her boyfriend told her Von Luna had been shot the night before. And she immediately, obviously, connected the dots and knew that was the shooting that she observed. This is just like, but stronger, the affidavit in People v. Warren, where the court held that where the other details in the affidavit closely track the actual details of the crime and the details provided by other witnesses, both at trial and new witnesses, then foundation has clearly been laid. But to the extent it hasn't, then a hearing is the place to resolve that, not the second stage. The state in its brief has contended that Mr. Vargas Can I go back to the hearsay? Yes, of course. If we take the rules of evidence that you're pointing to that says hearsay is admissible in post-conviction proceedings, how do we reconcile that with the rather difficult standard that applies to actual innocence? So that the evidence that is produced, the new evidence, is so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. So when we're dealing with hearsay, how does that play into the so conclusive test that's involved in actual innocence? Well, Your Honor, respectfully, the Supreme Court in Coleman has rejected this standard that no reasonable juror would find this petitioner guilty beyond a reasonable doubt. That is the Schlup standard from federal court, and in Coleman the court said our standard is not that high. We intentionally did not adopt that high standard. So what are you saying is the standard? The standard is, is there a reasonable probability that a different result would be likely at trial? Would this evidence cast the state's evidence in a new light? Would it raise a question, a reasonable doubt in a new juror's mind? It is a lower standard than the no reasonable juror standard. Okay. Well, we can debate that, but tell me how hearsay plays into that standard. Is there a reasonable probability that this new evidence would change the mind of the jury if it's hearsay? Yes. So conclusivity goes to the legal sufficiency of the claims and the evidence before you. And you're talking about conclusivity now. Yes, you were asking how hearsay will affect the conclusivity of the evidence. Well, I was using your standard of reasonable probability. Well, I agree with Your Honor that conclusivity is still a factor. I just disagree about the bar for conclusivity. The bar for finding evidence. Talking apples and oranges. So just tell me how that will have to wait, I guess, for another day or a little later. But tell me how hearsay under either so-called two standards you're talking about, how does hearsay play into? Because at the stage of the conclusivity determination, which I agree is the most important factor here, we are looking at the legal sufficiency of the claims before you. The court is required to take all of the evidence and all of the allegations as true. So hearsay actually doesn't play into the conclusivity of the evidence because hearsay is a matter about reliability of the evidence. And that cannot be determined until the third stage, once we have gotten past the legal sufficiency of the claims threshold. At second stage? Once we get past? Yes, the second stage. At second stage. Right, it's just about the legal sufficiency of the claims. And all of the evidence and allegations must be taken as true. So even if it includes hearsay evidence, as in Warren, the court tells you, you have to evaluate that hearsay evidence at the third stage. Perhaps at the third stage, once the witness takes the stand, the court, the fact finder, will determine this hearsay evidence is not sufficiently reliable to raise a question in future jurors' minds. But that determination can't be made? Well, they have to also consider whether it would eventually be admissible at trial? They don't have to consider that, actually. The remedy, if they did, the remedy would be acquittal, not a new trial. And that's why they say the rules are relaxed. You're presenting evidence that you say could lead to an eventual acquittal. But if it's hearsay evidence, how does it go in to a new trial? Well, the standard does not require that all of the evidence that would be presented at a third stage hearing could then be presented at a trial. The question is just, has it undercut our confidence in that guilty verdict? And some of the evidence, some of the witnesses from that third stage hearing, will then be presented at a new trial. But it is not required that all of that evidence could then be presented at the new trial. I think that is the driving motivation behind 1101B3, a recognition that in post-conviction cases, where we're talking about crimes that happened 10 or is in the case here 20 years ago, the rules of evidence have to be relaxed because the realities of these cases and of this work is that the evidence coming before us is not going to be perfect. And when we go to a new trial, we're going to be dealing with essentially at that point, a single eyewitness case. Michelle Scott is the only state witness left standing. And she has also been seriously undermined now by the statement of Andrea Thomas that says Michelle Scott was also drunk and high at the time of the crime and wasn't paying attention. And by Javon Owens' statement, who confirms they were both drunk and high and says that Michelle Scott, on the ride home, and when they went to the police to talk about the crime together, admitted to him she never saw the shooter's face. Not only that, Michelle Scott has all the hallmarks of an unreliable identification, as laid out in the social science embraced by the Supreme Court in Lurma. She was a stranger, not from the neighborhood, who made a cross-racial identification during a stressful crime involving a gun, which has been shown to divert attention from the perpetrator's face to the gun. Because this case comes down to a contest of the credibility of witnesses, it was air to dismiss it at the second stage, and a third stage hearing is required. Moving on to Mr. Velasco's ineffective assistance of counsel claim. Mr. Velasco had an alibi. It was supported by at least four witnesses. And the heart of this claim is that Mr. Velasco's trial counsel was wrong about the alibi. They thought his alibi was at Cullerton and Loomis, an intersection that put him essentially right across the street from the scene of the crime. Of course they didn't pursue that defense. An alibi at the scene of the crime is a terrible defense. But that was not his alibi. His alibi was actually seven times farther away at 19th and Alport, where four people who testified at the evidentiary hearing all say he was, Jose Velasco, was there with them before, at the time the shots were fired, and after. The trial counsel was also ineffective because they did not interview all of these alibi witnesses. If they had, their confusion and mistake very likely wouldn't have been easily cleared up. Now, of course, Strickland sets a high bar, and great deference is warranted for strategic decisions made by counsel at trial. But a decision that is based on a fundamental mistake of fact and that is driven by an investigation that was not reasonable and not adequate can never be a reasonable strategic decision on which trial counsel can rely to defend against this claim. But I'm just talking about a few blocks here. We're not talking, like, miles away or cities away. I mean, we're just talking about, you know, a couple blocks one way or a couple blocks another way. That's correct, Your Honor. We are just talking about a couple blocks, but I will say that the evidence, the map, and the record shows that these were quite long city blocks, and the fact that the alibi location... They were longer than regular city blocks? There is one that was longer. It was essentially the length of two blocks just because of the weird configuration of the streets of that location. All right. And the fact that it was seven times farther belies trial counsel's statement to appellate counsel within months of the guilty verdict that his alibi essentially put him at the scene of the crime. That can only refer to Cullerton and Loomis, not the alibi seven times away. It is a difference. My recollection is that the defendant gave two or three different locations for an alibi, and that was one of the reasons why the lawyer said they didn't put on an alibi because the state would then be able to call the other people who he had, I think it was relatives, one place and someone else, someone else, someplace else with other people, and then those people had convictions, and the lawyer was afraid of them being impeached with their prior convictions? Well, that's correct, Your Honor. I have two main responses to that point and question. One, that is based on trial counsel's testimony at the evidentiary hearing for a host of possible strategic reasons that she might have used to defend her choice not to pursue alibi defense. But the question isn't what in hindsight in 2020 could have been possible strategic reasons. The question under Strickland is what was her actual strategic reason? And the record, both in them writing Cullerton and Loomis on the pleading the day of trial, telling the court on the record the alibi was Cullerton and Loomis, and telling appellate counsel afterwards that the only reason she didn't present the alibi was because it essentially put him at the place of the crime. I mean, that is clear, that that was her actual trial strategy. And it's our position that it was manifest error for the court to hold otherwise. It was also manifest error... But the bottom line is it was trial strategy. I mean, counsel considered the possibilities that could happen here in terms of the background of the individuals and the distances and whether or not to call these alibi witnesses or to present the fact about where they were located at the time. So, I mean, it was based on, at that time, what appeared to be sound trial strategy. Well, our position is that a trial strategy based upon a fundamental mistake of fact and a lack of investigation cannot be reasonable trial strategy. And your point and Judge Lampkin's point goes to my second point. That trial counsel manifestly erred when it credited trial counsel's testimony because it used the same basis to credit her testimony as it did to discredit all of the alibi witnesses. The court held that where there were gaps or inconsistencies in her memory and she had to reach to imagine what the strategic reasons may have been supported the reliability. Because who can remember all the details 20 years later? But in the same breath, the court rejected each of the four alibi witnesses precisely because there were slight inconsistencies or slight discrepancies such as what time each of them showed up to 19th and Alport and who else might have been there at some point during the night. But we do know, there's no dispute that the defendant gave two different alibis early on. That the witnesses had questionable criminal background and that they didn't come back to the police for polygraph. I mean, that's not something where there's a lot of wiggle room for you. Well, and this case is analogous to Blackman, a Seventh Circuit case. And there were other reasons. There were other weaknesses or vulnerabilities to an alibi defense. But there the court held that where the trial counsel interviewed only one to two witnesses of a group of alibi witnesses, it could not evaluate the strengths of the alibis against the weaknesses or potential vulnerabilities as is the case here. Because if you only interview one or two of the witnesses, any weaknesses or credibility issues that those interviewed witnesses have cannot be weighed against the credibility strengths of un-interviewed witnesses and against the strength of these four alibi witnesses when considered as a collective whole. So even though there were weaknesses, which actually, some of them were explained in the evidentiary hearing record. Mr. Velasco explained to law clerk Joseph Runyon he gave false alibis because he was protecting Yesenia Martinez, who was considered a good girl in the neighborhood. And he didn't want her to get in trouble for hanging out with him and using drugs. Yesenia Martinez and Jesus Salazar explained that they didn't come back to the police station for polygraphs because Yesenia was under the impression they were calling her to make an appointment and they never followed up. And Jesus Salazar was afraid because he did have a pending charge at the time. And with regard to their prior criminal histories, the record is clear that these were juvenile offenses that would not have been admissible in the trial if they had taken the stand. So that is not a valid strategic reason to choose not to present the alibi. And perhaps in a case where there was a strong defense, it may have been a fair strategic decision to say we don't need an alibi. But here, the defense case was incredibly thin. They had one theory that they presented with no evidence and their only witness fell flat because of emotional problems. So there was a gaping hole in the defense case, which an alibi, even an imperfect alibi if that may be the case, would fill and would tip the scales in petitioner's favor. And to the extent that trial counsel said we were presenting another defense, so not this defense, well an alibi defense would have been consistent with and bolstered the defense they presented, which was mistaken ID and reasonable doubt and another perpetrator. An alibi corroborates all of those defenses. It does not conflict with them. All right. Why don't you sum up because you still have more bugs. Sure. So Mr. Velasco, for the reasons I just laid out, Mr. Velasco was prejudiced. The state's case was thin, relying only on eyewitness testimony, which warrants scrutiny, and the defense case was also threadbare, and this alibi defense would have filled a gaping hole. Because Mr. Velasco received ineffective assistance of counsel, he's entitled to a new trial. But at a minimum, he is entitled to an evidentiary hearing on his powerful case of actual innocence. Thank you, Your Honor. Thank you. State. May it please the Court, Assistant State's Attorney Iris Ferrosi here on behalf of the people. Your Honors, before you can even review petitioner's claims, you need the trial record, which has not been supplied. You need his prior PC record, which has not been supplied. In the record supplied to this Court is missing testimony from the Stage 3 hearing, including exhibits from some of the witnesses that recanted, which I have never seen because they were not provided to this Court, or when the appeal was filed. Without these important parts of the record, it will be impossible for you to decide in a de novo standard whether he has met a Stage 2 actual innocence claim, whether he has made a substantial showing of a constitutional violation. Keep in mind, the trial court had the benefit of the record on appeal, which you can tell by the testimony and the trial court's order. You will not have this benefit. So the trial court was in a better position. Deficiencies in the record were pointed out to the defendant. You pointed these out during the process. During the process when I was writing the brief. So I worked with what I had, which was the prior direct appeal, which was affirmed. This is not another reasonable doubt argument here. This is defendant's burden to supply this Court with the right record to review this claim. We're looking at the actual innocence claim. There's a section 122-2, which states the affidavits must be notarized. This is not, you know, if you want to, if you can. And if you can't do it, you have to state in your petition why you didn't notarize your documents. It's not stated in the petition. It was never stated that they couldn't do it because it's prison. It's never been stated in the petition, which is a requirement. Defense now says that they were sworn under the penalty of perjury. That's not, I don't see that in the record. And regardless, it has to be notarized for the obvious reasons. Now. What about the argument that there may be other corroborating testimony that sheds light on these unnotarized statements? Well, if you go to Andrea Thomas, who is the state's eyewitness at trial, hers is a typewritten statement with her signature allegedly at the last page. Okay. So that right there. We don't know who typed it. I think it was her lawyer, a lawyer. Her, even aside from that, the allegations that she puts in this document that they call an affidavit completely contradicts what she stated at trial, which was, I was not coerced into giving a statement. I was not, I did not see Michelle Scott from the time of the shooting until I ID'd the defendant. Now, in her document, it says Michelle Scott told me who to pick out. I saw her at the police station. The trial record that I could glean is they were at the police station two different times. Andrea Thomas came later. She was very reluctant to come. Michelle Scott went immediately and made an identification. Again, without the benefit of a trial record, this is speculation, but from what I could glean, they weren't even at the police station at the same time. So it completely contradicts. So you have an unauthorized document and statements in it that completely are contradicted by the trial record. And the standard is, if this were a retrial, what would happen? If this was a retrial and Andrea Thomas got on the stand and stated these things, she would be impeached on every single thing that she states. And we would obviously have a police officer that could testify they were not at the police station together. So all of that, without the benefit of a trial record, is what could happen at trial. It's not exoneration. It's not a not guilty. As far as Claudia Cruz, she also, hers was handwritten. The petition does not state why it wasn't notarized. And her statement also, which counsel says was sworn under the penalty of perjury, I don't see that in the record, but she never says in her statement, which is quite long, that she didn't see defendant during the shooting, that defendant wasn't present during the shooting. She dances around it and never actually says that. So if you can get past this fact that it's not notarized, and we're guessing that it is her that made the statement, we have to go to that. It's not exoneration. She doesn't say, I didn't see defendant. She says. So I ask you, doesn't People v. Allen say these cannot be considered? Yes. To not have the affidavits notarized can be a basis for dismissal at a second stage. And if you look at the court's order, that was not his only basis. He just pointed that out, that first off, it's procedurally wrong, and also said that these claims don't corroborate the defendant's claims in the petition because of the contradictions. And if the affidavits contradict each other, which they do, they can't support the defendant's claim because they're contradicting. For example, Claudia Cruz, who says it's her cousins, Arturo and Migueletto, were on the scene. No one's heard of these people until now. That was contradicted by other testimony that it was Erica Vargas, I'm sorry, Max Hernandez saw Migueletto shoot and other people saw Arturo shoot. So we have two different shooters now. None of these witnesses told anybody of these things that they saw. And when you look at that in an actual innocence claim, the record then is, at least for Andrea Thomas, robust, which her new testimony would be. It's rebutted. Let's go to the affidavits, the things that are affidavits. Tell me why those affidavits do not require this to move on. Well, like I said, Andrea Thomas at trial stated no threats or promises were made to her. She's not an affidavit. Right, so she's just a document. Okay, one minute. So Jonathan Miscauscus, his affidavit is all hearsay. And even if hearsay is admissible at a third-stage hearing, his hearsay statements would never come in at trial. Therefore, his affidavit would not change the results at trial because he would not be able to get up on the stand and say, so-and-so told me that someone else shot Juan Luna. That would never come in. It's inadmissible. But their argument is that it does come in under the Rule 1101.3. Well, even if this were enough to get it to a third stage and a retrial, it would never come in at retrial. And if you look at the ‑‑ so it can't be conclusive. If you look at the conclusive nature of an affidavit, it has to change the outcome. And this never will because it's all hearsay. He doesn't see anything about the crime, nothing. He just says some Ambrose told him that they lit up a Raza, and somebody told him that a Raza was shot at 18th and Loomis. So hearsay upon hearsay. Jovan Allens, who, again, without the ‑‑ I'm talking about Max Fernandez. Sorry? I'm talking about Max Fernandez. So Max Fernandez said that he ‑‑ okay, so his statement was taken at Pontiac Correction Center. He said that he snuck out that night and 20 to 30 minutes later saw Juan Luna with two other men, young men, and that he saw Miguelito shoot Luna once in the chest. Never went forward. Didn't know, even though a defendant was charged, until 2004 and still didn't go forward. So, again, the problem with ‑‑ There's no hearsay there, right? There's no hearsay issue. There's no hearsay. But it contradicts the other witness that said Arturo was the shooter, and that was Claudia Cruz. Hers was a statement. Hers was a statement. But the court's ruling was that they ‑‑ Claudia Cruz says these are my cousins, and, I mean, assuming she would know. But then Max Fernandez is then contradicting hers, her statement. If we don't consider statements, we don't consider statements. Yes, so if the statements aren't considered, standing alone you have Max Fernandez, right? Right. Going against the pretty much uncontradicted testimony of Michelle Scott at trial, who stated she was 15 ‑‑ I'm sorry. Again, this was taken not from the trial record, but she saw the petitioner for at least 15 minutes in broad daylight and then engaged in a face‑to‑face conversation with the petitioner. They discussed his hairstyle and the damage to Thomas's windshield, and he was about three to four feet away. Scott saw him again on a well‑lit street when they came back to Tito's and saw the petitioner approach Juan Luna, engage in a discussion, and their initial descriptions of the shooting were nearly identical to the police. So you would have this one witness, had this been a retrial, versus Michelle Scott. Okay, we also have Erica Vargas. Erica Vargas. That was in the affidavit, right? No hearsay with Erica. I'm sorry, Ron. So Erica Vargas never actually saw the shooting. She was up in her building but never actually saw. That corroborates Max Hernandez. But corroborates that maybe Miguelito was there, whoever that is, but not that Miguelito shot anybody. And according to Scott and Thomas, there were lots of young men, like Hispanic men by Tito's Tacos. So just for the fact she saw Miguelito and he was creeping, never saw anything. She heard a gunshot, right? Because she's easily been the defendant. From her viewpoint, she couldn't even see the scene of the shooting. So it doesn't exonerate the defendant. It would not change the result at trial. I don't want to say this, but I have to say it. What is disturbing me is we do have Hernandez. We do have Vargas. Then we have the mother of the victim saying she doesn't think it's the person. I mean, that strikes me as something that might change the result on retrial, that the mother of the victim doesn't think the shooter, or the convicted person is the shooter. Well, she testified at trial. She was the defendant's witness at trial. And obviously by the verdict, yes. I'm talking about with Hernandez now and with Vargas and with the mother. Even with Hernandez and Vargas, they would still, if they took the stand on a retrial, they would still be faced with a pretty rough cross-examination as to why they never came forward. Again, without the benefit of the trial record and these other recants that are out there that I've never seen, I'm not sure how much impeachment there would be. But weighing it against somebody that has no, even the defense counsel just stated, there's no reason to lie. Neither of them had a reason to lie back then. They weren't involved in a gang or anything. So even with that, I mean, the fact that the defendant shot his friend, I mean, it is what it is. It's not a gang shooting. There were witnesses that said they were all smoking PCP. So there was an argument. Again, I don't have the trial record, but that's what I gleaned from it. So to answer your question, yes, if you combine them, it looks pretty compelling. But if you piece them apart and if you think about it at retrial, what would happen? Then I don't think the petitioner has shown that there would be a change in the result of trial. And as far as the ineffective assistance of counsel claim, the fact that the defendant gave multiple alibis and then recanted them and that it had a guardian come and give yet another alibi, you have to look at it not in hindsight, but what these defense attorneys had to work with when they were going to trial. And this is what they had to work with. They had the defendant giving false alibis. They had the people coming forward but then not showing up to take a polygraph. So they came forward, spoke to the police, and then never came back again. So this is what the defense attorneys, who are both very seasoned lawyers. Murder test. Exactly. This is what they had to work with. And to say that that is, that they maybe mixed up like there was a viaduct and maybe there wasn't or got the Mexican restaurant's names wrong, is not enough to show sufficient performance. And they have not yet to show that there was any prejudice because these prior alibis would have come in and were followed by the state. The defendant came in. The defendant knows where he was. I mean, this would have been the argument the state would have made. The defendant knew where he was. Why is he giving multiple alibis? And then his guardian comes and gives another alibi. So that plus whatever criminal records they had, which I'm not privy to, I don't know where they're at. We have an issue about the criminal record, and they're arguing that because there were juvenile records that they couldn't have been used during the trial to impeach them. Well, I'm not sure what the records are. I haven't seen what the criminal history is. But, I mean, a juvenile record isn't necessarily going to be excluded. I think the state could make an argument. But even if it's excluded, I mean, the fact that these other alibis were saying, we were smoking PCP, we were drinking, they contradict each other how long the defendant was there. It was a long, long time ago. I mean, I think it would be all these things that they could be impeached on, especially on a retrial. So I don't think the defendant has met his burden. Also, you've not been given the trial record to even consider the error that he claims that there was an unfulfilled promise in opening statement, because typically your honors would look at the entire opening statement, not just one piece. It's like a prosecutorial misconduct. You don't just look at one little line. We don't have the benefit of the record. We don't know what the opening argument is or opening statement was or how they made it seem like there would be an alibi presented. Besides that, they never put that claim in their petition. This was brought up later. So I would ask you not to consider that. So I believe that at the end of the day, they have not met their burden. They have not supplied a thorough and complete record. I don't think they have shown that the result would change a trial for the actual innocence claim or that they have not shown any prejudice in an effective assistance claim. Thank you. Thank you. Counsel? I think you need to address the inadequacy of the record. Thank you, Your Honor. It is our understanding that the record is complete. The state's transcript? Yes, the state did identify, to the extent they were specific about what they identified, that it was missing. We filed a motion to supplement on August 9th of last year. This court granted that motion on August 29th, and the trial transcripts were submitted and lodged with the court at that time. I also personally called the court in January of this year to make sure the record was, in fact, complete, because there had been confusion swirling and we didn't understand why. I was told at that time that the record was complete. I called again in March and was told the record was complete. And I came to this court, to the clerk's office, last week to confirm before this argument that the record was complete. And I was told it was. Of course, if there is anything missing, we'll do everything we can to stop it. You were told you didn't look to see if the record was there? The record was already up in chambers, and they said I couldn't access it. That was the reason I went to the clerk's office. But, yeah, I mean, we are confused about why this problem continues. Before you did your brief, did you see a trial transcript? Yes, we have seen, yes. You saw a trial transcript? Yes. Because we haven't. Are you certain you saw a trial transcript? We have seen the trial transcript, and it was lodged with the motion to supplement in August of last year. This court granted that order, and the clerk's office confirmed for me that it was lodged. So I don't know where the confusion is coming from, but we can provide another trial record immediately after this. I'm very unfortunate to hear you haven't seen the trial record. I can't explain that because we provided it in August of last year, months before the state filed their response. And I have called the clerk's office multiple times and then tried to come in person to look at it myself. Any other questions on that issue? Everything that the state just came up here and argued was about the credibility of these witnesses. Everything she argued was about credibility determinations that would be made at a future retrial. And there is simply no question that those credibility determinations, that evaluation of a contest of eyewitness against eyewitness, cannot be evaluated at the second stage. The Supreme Court made that clear in People v. Coleman. It made it clear again in the second People v. Coleman. It made it clear in People v. Sanders. It made it clear in People v. Ortiz. She gave a bunch of arguments for why to believe Michelle Scott at the third stage. Well, Michelle Scott has been significantly discredited, and she had credibility issues at trial. She was on parole at the time she made an ID at night of a stranger, cross-racial ID during a stressful crime. The state said that the witnesses had no reason to lie. Well, the record just belies that. Andrea Thomas had a warrant pending for her arrest that was dropped when she cooperated in this case. She had a son with cerebral palsy who she needed to take care of, and she was terrified of going to jail to not be able to take care of him. Michelle Scott, she was on parole, and at the time of trial had pending drug charges as well. To the point about Vargas and Hernandez, which encompasses a whole host of issues, the notarization, the hearsay, we get a hearing on Vargas and Hernandez alone. These are two eyewitnesses who are credible, who corroborate each other and the state's eyewitnesses at trials on all the details of the crime other than the perpetrator. They are enough. In People v. Coleman, the Supreme Court made clear where new evidence directly contradicts a state witness at trial, then a hearing is required. And that is the limited inquiry before this court, whether a hearing is required, not whether a new trial is required, not what can be considered at a new trial, just whether a hearing is required. And I wanted to provide the court with the citations for the correct standard for the actual innocence standard, just whether a new result would be... Have they already been provided previously? They're in a brief. Okay. You can move on. No, I'd like... Okay. It's People v. Coleman at paragraphs 88 through 97, where they have an extensive discussion rejecting the more reasonable juror standard and making clear this is a preponderance of evidence and that the question is just if it undercuts our confidence in the guilty verdict and would raise new questions in future jurors' minds. It's also in People v. Ortiz at pages 10 through 11 and at People v. Serrano at paragraph 22. The state is asking this court to overrule the hearsay rule, the rules of evidence rule 1101B3. And to the extent that we're talking about Jonathan Moskowskis, he would be able to testify at a trial pursuant to a hearsay exception. So that issue is also not a problem for this claim. But, again, we're entitled to a hearing on Vargas and Hernandez alone. They contradict the state's witnesses. They prove Jose Velasco's innocence. They go to the ultimate issue before this court, like all of our witnesses before you do. Was Jose Velasco the shooter? They are all consistent. Jose Velasco was not the shooter. Thank you, Your Honor. Thank you. All right. I want to thank counsels for a long argument here. The court will take this under advisement. All right. We could put this in its place.